This is Raphael Ross. That's two three dash one six three one. Good morning, may it please the court. My name is Abigail Horner and I represent the appellant Raphael Ross. May I please reserve three minutes for rebuttal. Thank you in Rodriguez, the Supreme Court created a bright line rule designed to protect all motorists guilty and innocent alike. That rule holds that police officers during an ordinary traffic stop are confined to the traffic related mission and attendant safety precautions. In contrast, police officers cannot add time through off mission detours, objectively designed to investigate crimes. The police officers violated the stricter in Mr. Ross's case when at the outset of a traffic stop, they questioned Mr. Ross about his diamond Rolex watch and what he did for a living to afford it. Well, let's let's try to make that line a little bit brighter. You don't disagree that safety of an officer is part of that on task mission, right? That's correct. And so why don't we have here simply an observation and a question that, as the officer testified in the district court, seems to have found from the hearing was intended to diffuse the nervousness of the passenger and assess safety risk. Yes. So what the government says is that this was mere small talk designed to calm down Mr. Ross. And as a matter of context and common sense, that's not true. And to begin with, let's just establish that this is an objective standard as this court held in Hunter on a government appeal. The district court errs when it applies a subjective standard when determining whether a certain task is a detour under Rodriguez. So what the officer said in self-serving testimony was small talk designed to calm down Mr. Ross is not the question. The question before the court is the familiar objective one. What would this be? And as the court said in Hunter, the court needs to look at all of the facts. This is a pinpoint grid, an area with known for drug trafficking, high intensity policing. In this context, Mr. Ross, a young black man, is pulled over for a traffic violation. This is a pretextual traffic stop, which is allowed designed to take contraband off the street. The police officers immediately noticed that Mr. Ross is wearing not ordinary accessories, but a diamond Rolex watch and a diamond chain. And from the outset, Officer Smart asked him not only about his diamond Rolex, but what he did for a living to afford it. And when Mr. Ross answered, he worked in the area of home health aid. Both officers answered they immediately believed he was a drug dealer because home health aid is often an under the table cash industry. And that's the answer that drug dealers give. So what context tells us this isn't small talk? The officer is not following up about where he worked. He doesn't start sticking his head in the car or investigating. You know, he went right back to the patrol car to run his information. So why, if we're taking an objective approach here, as we have to, why is why is this off mission? It's off mission, Judge Bibas, because as soon as the officer has asked these questions, which are designed to find out how Mr. Ross could afford that diamond Rolex in this context. And let me just say, if we go to the laws of evidence under Chandler, that's admissible as circumstantial evidence of drug dealing. Not only the luxury. The luxury isn't the key part. The lodestone in Chandler is not that someone has $8,000 in cash deposits. The lodestone is that there's no legitimate explanation. So we probably wouldn't be here if there had just been a compliment about a diamond Rolex. But the officer followed that up immediately by asking, how can you afford this object? And that in Chandler comes in as evidence of drug dealing. That's not small talk. Traffic stops alone are anxiety producing. We know this from common sense and from the Supreme Court. But when an individual, this young man, was immediately asked, how can you afford this diamond Rolex? That's going to make him feel distress, embarrassment, and fear. And these are the facts that Rodriguez tries to deter. Rodriguez says, when you're stopped for an ordinary traffic violation, license, registration, insurance. Not, how can you afford this diamond Rolex? You in Gray's Ferry. You who were here in the pinpoint grid. And of course, everyone lives in neighborhoods. There's innocent people in neighborhoods. There's guilty people in neighborhoods. There's people passing through. And anyone could also be, frankly, driving a car that an officer wants to know, how can you afford this BMW? How can you afford this Lexus? That may have been the thought, but that wasn't the question. The question was about employment. And when we have cases like Hurd and Garner and most recently Steinman, why isn't asking someone about their employment in the context of a traffic stop simply small talk? Well, in Garner, their employment questions were part of the off-mission questioning, which also included criminal history and family. So we have the Garner case. But it's not employment separate from anything else. It's employment in context. It's employment, how can you afford this diamond Rolex? We eyeballed it at about $10,000. The government doesn't quibble with that. This isn't a jocular, calming statement. This is a statement asking for a legitimate explanation for a luxury. This isn't an Eagles jersey. This isn't, did you see the game last night? We wouldn't be here on those facts because they're not investigatory. This is investigatory because what the officers wanted to do was get into that car. And the government says in their brief, this didn't contribute to reasonable suspicion. In fact, they took exactly the opposite position in the district court at page 59 of the appendix, where they listed the diamond Rolex and the answer, home health aid, as item J in their list of reasonable suspicion. Mrs. Horne, Rodriguez asks us to focus on whether the stop was measurably extended. So what's measurable? Are you arguing that even a second is measurable? Because this conversation must have been, what, like, you know, 25 seconds. I mean, this is a fraction of a minute here. Does that make it a measurable extension? Yes. The government made this argument in district court and abandoned it on appeal. There's no de minimis exception. In Clark, there was 20 seconds of criminal history questioning. We cited the Nazario case out of the Fourth Circuit, where there were four seconds of death threats. The dissent in that case said, what do you mean this is four seconds? Measurably extended comes from cases that predate Rodriguez, from Johnson, from Mueller. And in those cases, the off-mission detour was simultaneous. And this gives police officers options. Police officers can do off-mission detours as long as they're simultaneous, which was in the Steinman case. But that didn't happen here. And when the Supreme Court described those earlier cases in Rodriguez, they were careful to say they didn't add time. So in Mueller, the search warrant was being executed. You can question a person at the same time. In Johnson, the driver is giving his information. The partner can question the passenger at the same time. There's no allegation that these questions were simultaneous here. They may have been short, but they're on the mark of somewhere around what happened in Clark. And this court said 20 seconds of criminal history questioning adds time under Rodriguez. But this was a single question that, as to the watch, it was an observation. And it's a single question of, what do you do for a living? Why, when we have cases that talk about putting people at ease and diffusing a situation, and we have the testimony that this was not just someone who was nervous, but up there with the top five most nervous people that the officer had observed, why isn't a question like, what do you do for a living, appropriate for putting someone at ease and diffusing a situation? Well, if I could, I might offer two things to that. First off, what would put a driver at ease during an ordinary traffic stop is what you expect. And what you expect is license, registration, insurance. Not this probing question of, you, young man, don't appear to be able to afford a diamond Rolex. What do you do for a living to afford it? And that's why it's important when the government tries to make this disjunctive, well, asking about a watch or asking about what someone does for a living is calming. That's not what happened here. They are connected. They're intricately connected. This isn't an accessory. This is an expensive luxury. And what can you do for a living to afford it? We wouldn't be here. We'd be having different facts if these two questions weren't combined. It's the follow-on that makes this so important. It's the follow-on that makes this distressing, embarrassing. And that makes one naturally would feel fear being probed in this way at the outset of a traffic stop. So how would you articulate the line between on and off mission if questions as to what you do for a living in some cases are appropriate? Well, I think Rodriguez tells us the test. We don't have to reinvent that. It's objectively aimed at detecting evidence of ordinary criminal wrongdoing. And we know from Chandler that an unexplained luxury, a luxury item in the realm of $8,000 or $10,000 without a legitimate explanation is circumstantial evidence of drug dealing. And we know from the government's filings in district court that they believe this advanced reasonable suspicion. Anytime you see a government brief and they're excluding facts like high crime area, pinpoint grid, he gave the answer home LFAID, which made the officer believe he was lying and must be a drug dealer, the court's antennae should go up. There's a reason they're leaving those facts out. Those facts are being left out because they show that this was investigatory, that this was probing, that the police officers were out trying to find contraband. They were trying to interdict contraband through pretextual traffic stops. And that's why they asked this question. Officer Smart at one point was asked by the government, probably not thinking about Rodriguez, why was his job relevant to your investigation? And he answered, because home LFAID is the answer that drug dealers give. Even if these questions were investigative in nature, if the officers while performing the remaining activities that they had to perform found reasonable suspicion, why wouldn't that save the evidence that they found? It doesn't save it because what the Supreme Court said in Rodriguez is that when a police officer adds time through an off-mission detour, that stop is tainted. It doesn't matter if it comes at the beginning, the middle, or the end. That's Rodriguez at 351 and 357. The seizure becomes unlawful. And that's what happened here. That's what this court said in Hurt. Does it matter how different the facts of those cases were? Like in the cases that you're citing to us, the investigation is over, and then there's an extension. That's not what happened here. There's a question in the middle, literally a question in the middle. That question doesn't lead to the evidence. It's things that happen after that lead to the evidence. Well, I can give you a case on point. And I actually disagree that it doesn't lead to the evidence. So let me just say quickly that the case is Hurt. And in that case, a police officer goes briefly off-mission by leaning into the defendant's truck. At that point, he's off-mission. It adds time. The Rodriguez moment has happened. There's no reasonable suspicion. After that, the defendant makes a furtive movement. He's taken out. Frisk. There's a gun in his waistband. The stop wasn't over at that point. They still hadn't run the driver's license, the registration. They hadn't finished the sobriety test. This court held in Hurt that the stop was tainted and the remedy was suppression. And in terms of did this actually affect what happened later, the government has made no record on this. And they made no record because these arguments gesture toward exclusionary rule exceptions that they've waived in district court and on appeal. It's pure speculation how this would have unfolded if the first moments of the interaction hadn't been about how could you afford this diamond Rolex. These are ephemeral situations. Mr. Ross's behavior could have changed. Maybe if he hadn't been put on his back foot in this way, he would have remembered what his parents shortly told him, which was keep your hands on the wheel and stop still. It's only speculation that this would have rolled out exactly the same way had it not begun on this footing. And the same thing for the police officers. They immediately, from that answer, believed he was a drug dealer because he said home health aid. And then they began what happened after. The government asks us to assume that they would have done exactly the same things. But these are discretionary actions. It's not like there's some policy that said, I would have done this regardless. They're gesturing towards some kind of inevitable discovery or attenuation. If they bring those up today, it will be for the first time an oral argument, which is unacceptable under the waiver doctrine. And there's simply no record. There's no district court finding. All of this is speculation. What is the default here? You've argued if it reasonably can be viewed as probing or investigatory, that that makes it off task. But if it can reasonably be viewed as intended to diffuse the situation as going to a safety issue, which one of those is the default? If both are true, it can be reasonably viewed with either characterization. I think that we would win because if there's like an equipoise situation, then the government's burden is to prove this. So then the defense would win. Questions? Thank you. Good morning, Your Honor. Sarah Solo, I represent the United States at the Lee. May it please the court. I'd like to begin where Judge Montgomery Reeves was asking a question or making an observation at the end of my friend's argument, which was that this question, what do you do for a living, by Officer Smart, it didn't lead to the evidence. And that is a key point that we spend the second half of our brief talking about. And we're not arguing attenuation or independent source or inevitable discovery, which are exceptions to the exclusionary rule. We are arguing for the sound application of the exclusionary rule. And perhaps I should have opened this portion of the brief with a citation to Mapp versus Ohio, the 1961 canonical exclusionary rule case by the Supreme Court or Wong Sung in 1963, two years later, where the Supreme Court gives us fruit of the poisonous tree. But the exclusionary rule, which we're applying here under Rodriguez in a car stop situation, is that you suppress evidence that comes from the alleged constitutional violation. We don't think saying, what do you do for a living is a constitutional violation. But even if it was, we don't need attenuation. We don't need independent discovery or independent source, inevitable discovery. There was no causal connection between that exchange, nice watch, what do you do for a living, and then all the independent indicia of reasonable suspicion that arose during this car stop that led these officers to think, there's a gun in this car, and I need to frisk for my own safety to see if there's a gun. After Officer Smart says, what do you do for a living, car stop moves on. There's no follow-up questions. He says, in fact, what he says is, OK, if everything checks out, I'm going to not give you a ticket for this, maybe a citation. And then he goes to run the individual's criminal history. It is the movements of Mr. Ross in the car where he's shifting his jacket around all over the place, which is what someone might do if they're trying to hide a gun. It's that he won't keep his hands on the wheels. He tries to get out of the car when Officer Foreman is standing there. And then Officer Smart sees in his criminal history check, oh, his last arrest was for having an illegal gun in a car. But let's go back to the first step in our Rodriguez analysis. Should we be considering this on or off mission? This was on mission. This is on mission activity that is objectively reasonable for a well-trained officer to engage in when they're trying to process a traffic ticket in an orderly manner, keep a visibly nervous motorist safe. He's shaking all over the place. He won't make eye contact. Both officers say right off the bat they see that. And it's just a sort of common ground of conversation. What do you do for a living? In fact, these are two strangers. You've got a motorist and you've got a police officer. They know nothing about each other. But as your colleague just pointed out, that question here was prompted by the observation of this very expensive item that raised a question in the officer's mind. There's a linkage there. And if we can look at that linkage and see that it reasonably, the question reasonably could be viewed as investigatory in that context, why doesn't that take it off mission? It's because it was not investigatory in that context. Saying what do you do for a living is not criminal investigation, not in a common sense view, certainly not under the case law, not in Rodriguez. In the post-Rodriguez cases of Clark and Garner, the type of stuff that the court adduces to be the launching of a criminal investigation is criminal investigatory in nature. Bringing a dog to a car to sniff it and see if there's drugs. Pointedly asking someone about their criminal history, their arrest, their lockups. When was it? What was it for? That's Clark. Just five minutes of that in Garner. One question, what do you do for a living? Even following, that's a nice watch. You must make a nice living. That's not criminal investigation. It's not criminal investigation under common sense either. This is sort of a natural entry point of conversation between two strangers. I don't know what else one could ask to try to just start talking to a stranger. Where are you from? What do you do? And nothing came of it. There was not follow-up questions. Oh, home health aid. What agency? How much do you make an hour? Do you really make that much money? Nothing like that. Neither by him, by officer Foreman. It was one question, car stop, moves on. And I want to return to this point of causation because it is so important for the exclusionary rule. This is a drastic remedy. It comes at societal cost. We throw evidence out of court and we do it because there has to be some connection between the thing that went wrong and the finding of the evidence. The Supreme Court a couple years ago in Hudson versus Michigan, and again, this is not some fancy exception. This is just the exclusionary rule. Exclusion has to be premised on the fact that the constitutional violation was a but-for cause of obtaining evidence. There's no but-for cause. I don't need attenuation. Attenuation applies where there's some causal connection, but it's attenuated. There's no causal connection. He says, what do you do for a living? Car stop, moves on. And then it's his behaviors, shifting the jacket around, won't keep his hands on the wheel, that makes Officer Foreman think, I think he has a gun in there. She gives her co-officer, Smart, a look. He's just talked to a fellow officer that says, yeah, the last time I stopped him, he had a gun in a car. This guy's acting like he has a gun in a car. And they frisk to find a gun, not to find drug proceeds or home health aid-related drug proceeds. They frisk to find a gun. And the district court's decision, which its findings of fact are, unless they're clearly erroneous finding on this court, at 473 to 475, the whole search or frisk is for the finding of a gun, not anything pertaining to drug proceeds. How do you distinguish this case from Clark? Clark, there was pointed criminal history questioning. So in the Clark case, the officer went back to the police MDT terminal in his car, looked up, and saw the driver's criminal history, came back, and then just started asking him a bunch of directed questions about it. Tell me the last time you were arrested. How about the time before that? How long were you locked up for? Criminal history questioning is investigatory in nature and off mission under this court's decision because it is designed to evoke from the person some questions about what they did in the past. And might there still be drugs? Might there be guns or drugs in this car now? Some basis that the officer then can have reasonable suspicion to start searching that  Is it your position that any time you ask that a question that proves that what the person does for a living is never investigative? Certainly not in these facts. Certainly not at the outset of a car where there's a nervous driver who you're trying to establish some ground of conversation for. I also don't quite understand their position, which seems to be it is an objective standard. It doesn't matter about the subjective intent of this officer, but it's investigative objectively only if it's in a high crime neighborhood with a black motorist. So you can ask a white motorist what they do for a living, but not a black motorist. I don't understand that rule. There's no Rodriguez for some neighborhoods and other neighborhoods and some drivers. Rodriguez is a general test for when you are, as a police officer, taking the traffic stop off of its mission and trying to probe around for evidence of other criminality and then doing something based on that in the car stop. And that is just not what we have here. We have a police officer who sees the watch, asks the question, moves on in the car stop. And it's all the other things that arise that lead him to frisk the car. I would like to direct the court's attention. So they repeatedly say, and they did again today at oral argument, no, it really did change the behavior of these officers. They immediately concluded he was a drug dealer. And everything that happened in the car stop after that changed because of that fact in the Home Health Aid answer. They cite Appendix 129, 192, and 249. They do it in their opening brief, their reply brief, over and over, these three citations. So we took a really close look at them. And in fact, what these citations of the record show, and I think it's important for the court's attention, two of the three of them were testimony from the officers about the very end of the stop. And they decide to seize the cash that Mr. Ross has in his pocket. And both foreman is asked about this. And then actually, Judge Rebrano starts himself asking the other officer about this at page 215 of the appendix. So at the end of the car stop, either Mr. Ross's mother or grandmother shows up. And she asks for the money back. And she asks for the watch back. And the officers actually give her back the watch. They clearly don't think it's such important evidence of criminality because they give it back. But they don't turn over the money. And they decide now that they found drugs in the car, and the money has a certain rubber band around it and currency denominations. And they say, and the fact that he said he was a home health aide, we decide that makes it more likely to be criminal proceeds under forfeiture and seizure rules. So we're going to hold on to this cash rather than turn it back. Those are two of the three times in the record that the officers say this was relevant to their investigation. And they're talking about the very end of the stop, way after the frisk, which was for a gun, way after the finding of the drugs. That is where, at all, this home health aide thing comes back into the equation. The record does not show. They can say it here. But the record does not give any support for the fact that it affected what happened after that question was asked for the rest of the stop until the very end. So can we back up a bit? Determining initially whether we have a Rodriguez moment or not, how is it that you would articulate the dividing line between what is on and off mission? We were looking at cases and pulling bits and pieces of this set of facts and the other. But what are the lessons that you draw from that for any sort of articulable test that could be applied by district courts? I think Rodriguez does a fair enough job laying it out. It's things that are on mission are either they are naturally part of the processing of a traffic ticket, the license, the registration, making sure the car is insured. As this court said in the Stewart case, which is a little bit different from Judge Hardiman's opinion in 2024, questions about travel history fall within the processing of a traffic ticket. They're on mission under Rodriguez because you're just finding out about the travel of the driver and the use of the car that gave rise to whatever this traffic infraction might be. There are things designed to ensure officer safety, which is what the Hunter case in 2023 really clarifies. And that's why you can always run a criminal history check. Police officers that are in the moment and they're often by themselves or with another partner in what could be a tenuous situation with people in a car in a traffic stop, they have to make sure that they can process this ticket safely. Mims tells us long ago case that you can even take the people out of the car. So a subset of activities that are confined to processing the driving ticket, making sure the car checks out, the driver checks out, it's not a stolen vehicle, all of that, it's insured. So the traffic safety mission and then the officer safety mission as you're doing the traffic safety mission. And I think that this court should clarify in this case that just common rapport between the officer and the driver like the Ninth Circuit recently found in Steinman is permissible. Drivers, I don't think necessarily makes them feel more calm when they have some robotic police officer who just say license registration. That could be very unsettling too. You want to know you're dealing with a human. And so surely if the officer and their kind of daily experience determines that, it'll make this go smoother and it'll deescalate. If I exchange a couple pleasantries with this person and ask a few sort of general background anodyne questions, they'll take issue with my characterization of this as anodyne, but that should be the rule of decision. And then as applied here, especially if the answer to the question could be somewhat provocative, ah, home health aid, all that, something, some drug deal issue. If you don't follow up on it, you've acted constitutionally. They don't know what the answer to the question is going to be and they hear it. If you don't press it, if you don't use that to try to generate reasonable suspicion, you have stayed within the confines of Rodriguez. And that is what happened here. It was other things that arose in this car stop that led them to think there was a gun in there. Do you agree with Ms. Horne that if you can objectively look at a situation and a question in context can be viewed as reasonably going to concerns about safety, but also because of linkage to observations or questions that came before could be reasonably viewed as investigative that the defense wins? No, absolutely not. So the exclusionary rule is a drastic remedy. This Rodriguez line of cases still sits within the exclusionary rule. We're talking about suppressing and throwing out evidence and why, because there was a constitutional violation arguably in a car stop. But so we have to think about the exclusionary rule canon of cases in which this sits. The Supreme Court's decision in Herring in 2009 says the exclusionary rule is for intentional, grossly negligent, reckless police behavior, law enforcement behavior, violating constitutional rights. The exclusionary rule does not exist. It's a drastic remedy. This is not like a government good code of conduct or something where judges sit after the fact and three years later say, we like that, we don't like that. In Herring itself, they had arrested someone on a probable cause affidavit that was later withdrawn. But the police officer didn't know that. They do a search and censure to arrest. Justice Roberts says the evidence still comes in. If the police is not acting grossly negligent, reckless, and intentional when they're violating someone's constitutional right, we don't apply the exclusionary rule at all. And so surely, if we're in some sort of equipoise situation and this officer could be acting objectively reasonable, and he was, the exclusionary rule should not apply. And then when there's zero causal connection between that potentially questionable question and everything that follows, the evidence should not be suppressed. Thank you. Thank you, Your Honor. I'll just begin where we started. The government gestured towards good faith. That's waived at two levels. It's waived in the district court. It's waived in their brief. We've never heard anything about those words anywhere or any case. Even if the court were to consider it, this behavior was deliberate and is deterrable and should be deterred. The government stands up today and says that they're arguing but for causation. Again, this was waived in district court. Those words appear nowhere in the district court filings by the government. In the government's brief, there's no case on point, not even Wong Sung coming up today. For the first time in oral argument today, they're invoking this doctrine. They're saying they're not dealing with any exclusionary rule exceptions, which is actually not true because what they're asking this court to do is to imagine that despite this illegal behavior, the stop went on and to find out whether something, the evidence would have been uncovered legally. That's exactly what independent source and inevitable discovery ask. As to whether there is but for causation, we've explained absolutely that there is. The seizure becomes unlawful at the moment the police officers go off duty. That's Rodriguez. Everything this unlawful seizure produced is suppressible. That's what this court held in Hurt. That's what the Ninth Circuit held in Landeros. That's what the Tenth Circuit held in Frazier. All cases cited in our brief. Even if the court were to go with the government's kind of framing of this, the government made no record whatsoever as to what would have happened if not for this illegal detour. It's all speculation. The government is asking the court to kind of game out how independent humans would have interacted without these questions, what Mr. Ross would have done, what the police officers would have done. Ms. Horn, following up on Judge Montgomery-Reeves' question, do you agree that there is relevance after the question and answer that we have here, there's relevance to the steps that the officers take immediately afterwards, that is proceeding with the processing of a citation? Well, first, I think the first answer is no, but I have a backup answer if you think there is. No, because what the Rodriguez analysis is, we ask, what is the Rodriguez moment? That's when the officer went off mission, when they asked about the diamond Rolex and how he could afford it, and was there reasonable suspicion at that mission? No, there wasn't. So that's the end of the story. If the court thinks what the officers did after can somehow tend to show objectively whether this was small talk or investigation, everything they did after was designed with the idea that Mr. Ross was a drug dealer. So it all only circles back to confirm that what they were doing with this question was demanding a legitimate explanation for a luxury, because they believed these were drug proceeds. The government, I think, wants to frame this as something about remedy and not about the Rodriguez error in the first place, but they've waived all that. And there isn't any merit to it anyway, because it's completely speculative. It's not like we have, let's say, the car is being towed, and then after it's towed, it's going to be inventory searched. And we know one thing follows from another, because at the hearing, they put in the policy, and they made a record of that. Here, we have questions, and then we have humans who behave. And Mr. Ross takes his hands off the wheel. And we don't know if he would have moved in those ways had he not been, at first, confronted with his diamond Rolex and with the question of, how could you possibly afford this? The police officer, Officer Foreman at the window, starts asking him questions. Why are you so nervous? Why are you moving? Maybe she wouldn't have asked those questions. We just simply don't know how this would have unfolded if it hadn't begun with the Rodriguez violation. All of that is speculation. There's no district court record on it. There's no testimony on it. The government is making it up in its brief and before this court in order to save what is a plain Rodriguez error. Questions? OK. All right. We thank both counsel for an excellent briefing and excellent, very helpful argument today.